## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

LAZAREK AUSTIN, #K-77091,

      Plaintiff,

v.

SPILLER, *et al.*,

      Defendants.

Case No. 18-CV-01152-SPM

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court is a Motion for Summary Judgment (Doc. 169) filed by the Defendants John Baldwin ("Baldwin"), Kent Brookman ("Brookman"), Shaun Gee ("Gee"), Jason Hart ("Hart"), Jacqueline Lashbrook ("Lashbrook"), James Leek ("Leek"), Kevin Reichert ("Reichert"), William Spiller ("Spiller"), and Kevin Verble ("Verble") (collectively "the Defendants"). For the reasons set forth below, the Court **DENIES** in part and **GRANTS** in part the Motion for Summary Judgment.

### PROCEDURAL BACKGROUND

In September 2019, Plaintiff, Lazarek Austin ("Austin"), filed his Second Amended Complaint (Doc. 88) alleging multiple violations of his constitutional rights while he was housed at Menard Correctional Center ("Menard") in 2017. The complaint sufficiently pleaded the following five claims against the Defendants:

**Count 1:** Defendants Spiller, Gee, Leek, Reichert, Verble, Lashbrook, and Baldwin, individually, and in conspiracy with one another, violated the First

Amendment by placing Austin in administrative segregation[1] in retaliation for refusing to cooperate with prison officials' investigation of a staff assault, or by failing to remedy the illegal placement.

**Count 2:** Defendants Spiller, Gee, Leek, Reichert, Verble, and Lashbrook, individually and in conspiracy with one another, retaliated against Austin in violation of the First Amendment and violated his due process rights under the Fourteenth Amendment by issuing him a false disciplinary report.

**Count 3:** Defendants Brookman, Hart, and Lashbrook knew the disciplinary report issued to Austin was false and written in retaliation in violation of the First Amendment, but found Austin guilty regardless, denying him of his due process rights under the Fourteenth Amendment.

**Count 11:** Defendant Spiller subjected Austin to unconstitutional conditions of confinement in violation of the Eighth Amendment and retaliated against Austin in violation of the First Amendment when he placed Austin in a dirty cell without blankets, sheets, cleaning supplies, hygiene products, a usable mattress, toilet paper, his blood pressure medication, or a change of clothes on April 26, 2017.

**Count 13:** Defendants Baldwin and Lashbrook subjected Austin to unconstitutional strip searches when they enforced a policy of strip searching all segregation inmates at Menard in violation of the Fourth and Eighth Amendments.

---

[1] Following the interview on April 26, 2017, Austin was transferred to restrictive housing located in the North II Cell House on investigative status. (Doc. 180, p. 3). The exhibits clarify that Austin was not placed in "administrative segregation" or "detention," as those terms are used by Menard staff. Rather, he was celled in a restrictive housing gallery that contained cells for inmates "in" investigative status/segregation and disciplinary segregation. (Doc. 169-5, p. 58-59; Doc. 169-6, p. 70-71; Doc. 169-8, p. 73-75, 83; Doc. 181-1, p. 4). Therefore, the Court will refer to the type of confinement Austin was placed in on April 26, 2017, as investigative status or investigative segregation going forward.

The Defendants responded to Austin's Second Amended Complaint on September 30, 2019, denying all of Austin's allegations, demanding a trial by jury, and asserting as affirmative defenses Qualified Immunity, Sovereign Immunity, Injunctive Relief Barred, and Mental or Emotional Damages barred (Doc. 90).

On February 9, 2022, the Defendants filed their motion for summary judgment, which included exhibits 1-16 (Doc. 169). On May 16, 2022, Austin filed his response to the motion (Doc. 179), his response to the undisputed facts section in the Defendants motion for summary judgment (Doc. 180), and his own statement of additional uncontroverted facts (Doc. 181) which included exhibits 1 and 2.

### STATEMENT OF FACTS

In April of 2017 Austin was housed at Menard (Doc. 169, p. 2). At that time, the Defendants were employed as followed:

- Baldwin was the Acting Director of the Illinois Department of Corrections ("IDOC") (*Id.*);

- Brookman was a correctional lieutenant at Menard and assigned to the Adjustment Committee (*Id.*);

- Hart was a correctional sergeant at Menard and assigned to the Adjustment Committee (*Id.*);

- Lashbrook was the warden at Menard (*Id.*);

- Spiller was the Intelligence Unit Coordinator at Menard (*Id.*);

- Gee was a correctional officer in the Intelligence Unit at Menard (*Id.*);

- Leek was a correctional officer in the Intelligence Unit at Centralia Correctional Center ("Centralia") (Doc. 169, p. 3);

- Verble was the Deputy Commander of Intelligence at the IDOC (*Id*.);

- Reichert was the District Intelligence Coordinator at the IDOC (*Id*.).

On April 23, 2017, a staff assault occurred at Menard that resulted in the injury of five correctional staff members (Doc. 169, p. 3; Doc. 180, p. 2). In the days following the incident, Intelligence Unit personnel were called from nearby IDOC facilities to assist with the investigation and interviews (Doc. 169, p. 3; Doc. 180, p. 3). On April 25, 2017, Austin was interviewed by Leek about the assault on the Menard staff (*Id*.). In his interview, Austin denied having any part in the assault or being a member of the Vice Lords, a security threat group at Menard. (Doc. 181, p. 2).

The next day on April 26, 2017, Austin was again interviewed by correctional staff (Doc. 169, p. 3; Doc. 180, p. 3). This interview was witnessed by Verble (*Id*.). During the interview, Austin again denied having any knowledge of the staff assault, and he asserted that he was not a member of the Vice Lords(Doc. 181, p. 2). After the interview, Austin was escorted to the segregation unit by Spiller and placed in cell N2:02:31 (Doc 169, p. 4; Doc. 181, p. 3). On May 4, 2017, Austin was moved to cell N2:04:42 (Doc. 169, p. 4; Doc. 180, p. 4).

On May 9, 2017, Austin was served with, and signed, a disciplinary ticket written by Spiller (Doc. 169, p. 4; Doc. 180, p. 4-5). Austin did not fill out the section on the ticket indicating he intended to call any witnesses or present any evidence for the Adjustment Committee to consider (Doc. 169, p. 5; Doc. 180, p. 5).

On May 16, 2017, Austin appeared before the Adjustment Committee for a hearing on the disciplinary ticket (Doc. 169, p. 5; Doc. 180, p. 5). Brookman was the Chairperson and Hart was a member of the Adjustment Committee (*Id.*). The result of the hearing was that Austin was disciplined with 1 year of C Grade, 1 year of segregation, and 1 year of commissary restrictions (Doc. 169, p. 5; Doc. 180, p. 5-6). As the warden of Menard, Lashbrook concurred with this punishment (*Id.*).Austin was housed in North II from April 26, 2017, until he was transferred out of Menard on September 11, 2017 (Doc. 169, p. 6; Doc. 180, p. 6).

## LEGAL STANDARD

The Court can only grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has laid out their foundation for summary judgment, "the burden shifts to the nonmoving party who must offer specific facts that show a genuine issue of fact for trial." *Cincinnati Live Ins. Co. v. Beyrer,* 722 F. 3d 939, 951 (7th Cir. 2013) (internal citations and quotations omitted). In fact, it is only disputes over facts that will affect the outcome of the case that will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When determining if genuine issues of fact exist, the Court must view the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Bennington v. Caterpillar Inc.*, 275 F.3d 654 (7th Cir. 2001);

*see also Tolan v. Cotton*, 572 U.S. 650 (2014). These principles of summary judgement still apply when the defendant has invoked qualified immunity. *See Tolan* at 656-57. At the summary judgment stage, it is not the Court's function to weigh the evidence or its credibility, but to simply determine if there is a genuine issue for trial. *Anderson*, 447 U.S. at 249.

## ANALYSIS

In their motion for summary judgment, the Defendants assert that because Austin failed to provide evidence to establish his claims, because the Defendants lacked the personal involvement required for Austin's claims, because Austin was afforded all required due process protections, and because the Defendants are entitled to qualified immunity that judgment is required as a matter of law (Doc. 169, p. 7-8).

Austin argues in his reply that because there are issues of material fact summary judgment is not proper (Doc. 179, p. 3).

## I.   COUNT 1

### A. Retaliation

To prevail on his First Amendment retaliation claim, Austin must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citations omitted).

It is undisputed that "truthfully answering questions during an investigation, even if those answers are not what the officers want to hear" are protected by the First Amendment. *McKinley v. Schoenbeck*, 731 F..App'x 511, 514 (7th Cir. 2018).  In his affidavit, Austin alleges that during these interviews, Verble threatened to place Austin in administrative detention if he did not implicate other inmates (Doc. 181-1, p. 3). Austin further alleges that when he refused to point the finger at other prisoners Spiller became angry and Austin was taken directly from the interview room to the segregation unit. (*Id.* at p. 3-4). Based on these facts, it seems reasonable to infer that the Defendants were angered by Austin's speech, and they retaliated against him by placing Austin in investigative segregation.

The Defendants dispute Austin's recollection and allege their own version of events. The Defendants allege that during interviews with other inmates Austin was identified by five different confidential sources as being a leader of the Vice Lords, and it was this information that led to Austin's discipline (Doc. 169, p. 5-6). However, the Court will not weigh the two vastly different versions of events alleged, as this is exactly the kind of dispute over material facts that is best left for a jury. Therefore, in regard to the Count 1 of retaliation against Spiller, Gee, Leek, Reichert, and Verble, the Defendants' motion for summary judgment is denied.

## B. Civil Conspiracy

To establish a civil conspiracy claim the plaintiff must show that there was (1) an express or implied agreement among two or more individuals to deprive plaintiff of his or her constitutional rights, and (2) an overt act in furtherance of the agreement

to deprive those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). If the agreement was not expressly made there must be some evidence or factual allegations which would suggest a "meeting of the minds." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000).

Here, Austin's conspiracy claim falls at the very first hurdle. There is no claim that there was an express agreement among the Defendants. So, to survive summary judgment Austin must show there was an implied agreement. Austin argues that because there were multiple correctional officers in the interview room that there must have been an agreement to retaliate against him for his truthful answers. (Doc. 181, p. 3; Doc. 181-1, p. 3). However, this is not enough to suggest that there was a "meeting of the minds," and the acts allegedly performed by the Defendants were not so abnormal as to be "unlikely to have been undertaken without an agreement." *Amundsen*, 218 F.3d at718.

Therefore, in regard to the Count 1 of civil conspiracy, the Defendants' motion for summary judgment is granted.

## C. Failure to Intervene

The allegation in Count 1 against Warden Lashbrook and Director Baldwin is not that they directly participated in the placement of Austin in restrictive housing on investigative status in retaliation for refusing to cooperate with the investigation, but rather, that Austin communicated with Lashbrook and Baldwin about the bogus placement, and they failed to remedy the situation (*See* Doc. 85, p. 4).

"[D]eliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turns a blind eye to it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (citing *Vance v. Peters,* 97 F.3d 987, 993 (7th Cir. 1996). "An inmate's correspondence to a prison administrator may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional violation." *Perez*, 792 F.3d at 781-82. A plaintiff, however, must "offer some record evidence that, because of the purported letters, the defendant officials knew of a constitutional deprivation and…failed to remedy it." *Vance v. Peters*, 97 F. 3d 987, 993 (7th Cir. 1996).

Here, Austin has failed to provide evidence that Lashbrook and Baldwin acted with deliberate indifference and failed to intervene in his alleged retaliatory placement in investigative segregation on April 26, 2017. As to Lashbrook, there is no evidence in the record that she was even aware that Austin had wrongfully been placed in the restrictive housing unit by Spiller, Gee, Leek, Reichert, and Verble. Austin argues that he "corresponded" with Lashbrook regarding his allegations of retaliation. (Doc. 179, p. 8). But there are no copies of these correspondences in the record, and Austin does not mention them in his affidavit (*See* Doc. 181-1).

Austin also argues that Lashbrook had knowledge that he had been placed in segregation in retaliation for exercising his First Amendment rights based on a comment made by Brookman during the Adjustment Committee hearing. Austin claims that Brookman stated that even though "the report did not describe the prohibited conduct…he had to find [Austin] guilty because staff had been assaulted,

and if he did not find [Austin] guilty the warden would be down his back." (Doc. 181-1, p. 6). This comment does not shed any light on Lashbrook's knowledge regarding Austin's previous placement on investigative status on April 26, 2017. Based on this statement, no reasonable jury could conclude that Lashbrook knew that Austin's constitutional rights had been violated and that she had an opportunity to intervene.

Finally, Austin points to a conversation he had with Lashbrook to support his claim that she failed to intervene. In his affidavit, Austin attests that he spoke to Lashbrook on May 26, 2017 (Doc. 181-1, p. 6). He asked her why he was in "administrative detention" and complained that he had received a false disciplinary report. This conversation, however, took place after the Adjustment Committee had recommended that Austin be disciplined with 1 year in segregation and Lashbrook had concurred in the recommendation. (Doc. 169-15). Thus, at that point in time, Austin was no longer being held in restrictive housing for investigative purposes (*see* Doc. 169-8, p. 82, 95), and Lashbrook no longer had a "realistic opportunity to prevent" Defendants' retaliatory placement of Austin on investigative status in April 2017. *See Gill v. Milwaukee*, 850 F. 3d 335, 342 (7th Cir. 2017).

Because Austin has not provided any evidence of Lashbrook's knowledge of the retaliation until after he was removed from investigative status and serving in disciplinary segregation, summary judgment shall be granted as to Lashbrook for the allegations in Count 1.

The Court also finds that summary judgment should be granted as to Director Baldwin. Austin argues it is undisputed that Baldwin was aware that Austin was

subjected to unlawful retaliation and unconstitutional conditions of confinement, as he sent Baldwin "several letters, which he received, complaining to him about the unfair treatment that I was receiving at Menard." (Doc. 181-1, p. 7).

Taking Austin's statement as true, that he did in fact send letters to Baldwin complaining about his treatment at Menard, the Court does not find that this testimony is sufficient evidence for a jury to reasonably find that Baldwin knew specifically about the retaliatory placement in restrictive housing asserted in Count 1 and that Baldwin had an opportunity to intervene. Austin does not specify the content of the letters, when he wrote the letters, how many letters he wrote, or how he knows that the letters were received by Baldwin. Furthermore, there are no copies of any letters in the record.  *See Daugherty v. Page,* 906 F. 3d 606, 611 (7th Cir. 2018) (noting that at the summary judgment phase "conclusory statements not grounded in specific facts are not enough") (internal citations and quotation omitted). *See also Miller v. Baldwin*, No. 17-CV-859-MAB, 2020 WL 7027489, at *21 (S.D. Ill. Nov. 30, 2020) (granting summary judgment as to the director of IDOC where the plaintiff had sent letters regarding inadequate medical treatment and there was no evidence that the director received or otherwise knew of the plaintiff's health issues). Therefore, the Court finds that there is no genuine issue as to whether Baldwin knew a constitutional violation had been committed and realistically could have prevented it. As such, summary judgment is granted as to Count 1 against him.

## II.     COUNTS 2 and 3

Austin claims that the Defendants violated his First and Fourteenth Amendment rights when he was issued and found guilty of the allegedly false disciplinary ticket. This Court will review the two potential constitutional violations separately.

### A. First Amendment

As previously stated, for Austin to prevail on his First Amendment retaliation claim, Austin must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges*, 557 F.3d at 546.

Here, as with Count 1, Austin has pled enough to survive summary judgment regarding his claim against Spiller, as he was the one who issued the disciplinary ticket. However, as this Court previously found, there is not enough evidence to show that there was a civil conspiracy involving the other defendants.

Therefore, in regard to the Count 2 First Amendment violation, the Defendants' motion for summary judgment is granted in regard to Defendants Gee, Leek, Reichert, Verble, and Lashbrook, and denied in regard to Defendant Spiller.

### B. Fourteenth Amendment

"The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property." *Isby v. Brown,* 856 F.3d 508, 524 (7th Cir.

2017). When an inmate raises a procedural due process claim based on a false disciplinary ticket and the related disciplinary proceedings, the Court undertakes a two-part analysis. *Id.* The Court first evaluates whether the prisoner was deprived of a protected liberty interest, and then second, evaluates whether the process he was afforded was constitutionally deficient. *Id.* (citing *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)).

Generally, prisoners "do not have a liberty interest in avoiding brief periods of segregation, whether administrative or disciplinary." *Smith v. Akpore*, 689 F. App'x 458, 460 (7th Cir. 2017). *See also Hardaway v. Meyerhoff,* 734 F.3d 740, 743 (7th Cir. 2013). A protected liberty interest is triggered only when the segregation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Lisle v. Welborn,* 933 F.3d 705, 721 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). *See also Miller v. Dobier,* 634 F.3d 412, 414–15 (7th Cir. 2011). In order to determine if a sentence of segregation amounts to an atypical and significant hardship, the Court looks "to both the duration of the segregation and the conditions endured." *Lisle*, 933 F.3d at 721 (citing *Marion,* 559 F.3d at 697).

In the context of prisoner disciplinary proceedings, due process requires that Austin be provided with "advance written notice of the charges, the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least 'some evidence' in the record, for any disciplinary action taken." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006) (citing *Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 454-55 (1985)). Where the

procedural due process requirements are met, issuance of a false disciplinary ticket fails to state a claim. *See Hanrahan v. Lane*, 747 F.2d 1137, 1141 (7th Cir. 1984).

Defendants do not put forth any arguments regarding whether Austin's time in disciplinary segregation implicated a protected liberty interest. The Court, therefore, need not address whether a liberty interest was implicated here. Rather, the question is whether the procedures followed during the Adjustment Committee hearings were constitutionally deficient as Austin alleges.

The Defendants argue that all the constitutionally required conditions were provided to Austin. Austin acknowledges that he was given a copy of the disciplinary ticket, he did not fill out the bottom of the ticket indicating that he had witnesses or evidence he wanted the Adjustment Committee to consider, and he attended the Adjustment Committee hearing and was allowed to make a verbal statement (Doc. 180, p. 5; Doc. 181-1, p. 5)). Austin argues it is disputed, however, whether the Adjustment Committee was impartial, and if their recommended disciplinary action was support by sufficient evidence.

Austin claims that the impartiality of the Adjustment Committee is called into question based on the statement made by Brookhart during the hearing. As previously discussed, Austin attests that Brookman stated that "he knew the report did not describe the prohibited conduct," but that Brookman had to find Austin guilty or the "warden would be down his back" because there had been a recent staff assault (Doc. 88, p. 36; Doc. 181-1 , p. 6). Austin claims Hartman nodded in agreement.

The Court finds that this statement does not create a genuine issue to be determined by a jury regarding the impartiality of the Adjustment Committee. It is not clear why Brookman would have said this comment or what was intended, as the disciplinary ticket does in fact describe the prohibited conduct with which Austin was charged – holding a leadership position in a security threat group ("STG"). [2] Austin was found guilty of violating Offense 111 Security Threat Group Leadership Activity. (*Id.*). A prisoner can be found guilty of this offense for "[k]nowingly accepting or assuming any leadership position or a position of authority over other offenders in any security threat group or unauthorized organization." Offense Numbers and Definitions , 20 IL ADC § 504 app. A. Spiller testified that a disciplinary ticket for an Offense 111 will usually be issued if an inmate has been identified by two sources as holding a leadership position in a STG. (Doc. 169-8, p. 63). The disciplinary ticket describes five confidential informants identifying Austin as holding a leadership position within the Vice Lords STG (Doc. 169-14, p. 1). Thus, the ticket states the prohibited conduct, and Brookman's statement does not show impartiality, only that there was a miscommunication between Brookman and Austin.

Furthermore, the record shows that the recommended disciplinary measures were supported by "some evidence," which "is a lenient standard requiring no more

---

[2]Only adding to the confusion, the statement is rephrased in Plaintiff's Statement of Additional Uncontroverted Material Facts to claim that Brookman told Austin that "the *Investigative Report* did not describe that the discipline was in retaliation of Plaintiff refusing to become a false informant, but Defendant Brookman told Plaintiff he had to find him guilty because staff had been assaulted and Defendant Lashbrook would be angry if he did not." (Doc. 181, p. 6) (emphasis added). In the Amended Complaint, Austin states that "Defendant Brookman and Hart acknowledged that the disciplinary report did not contain any prohibited conduct to support the charge that I was a gang leader but still found plaintiff guilty citing pressure from the Warden Lashbrook." (Doc. 88, p. 36). Thus, it is not clear what "report" or whose conduct to which Brookman was referring.

than a modicum of evidence." *Webb v. Anderson*, 224 F. 3d 649, 652 (7th Cir. 2000) (internal citations and quotations omitted). Here, the Adjustment Committee recorded that they relied on written report provided by Spiller and found the confidential sources reliable based upon Spiller's verification. (Doc. 169-15).  At the hearing, Austin did not present documented evidence or witnesses to the contrary, only his own testimony that the disciplinary ticket was retaliatory. The fact that Brookman and Hart gave more weight to Spiller's version of events and did not independently assess or investigate the statements made by the confidential informants does not demonstrate impartiality or lack of supporting evidence. Rather, these arguments only show that Austin disagrees with the outcome of his disciplinary hearing. *See Culbert v. Young,* 834 F. 2d 624, (7th Cir. 1987) ("[t]he Constitution does not require that the evidence relied upon logically preclude any conclusion but the one reached by the disciplinary board").

There is no evidence to suggest that Austin was not afforded the process he was due prior to his disciplinary segregation sentence. Accordingly, summary judgment is granted as to his Fourteenth Amendment claims in Counts 2 and 3.

### III.    COUNT 11

Austin claims that in retaliation for maintaining his innocence in the April 23, 2017 staff assault and his disavowal of membership in the Vice Lords gang, Spiller subjected him to unconstitutional conditions when he refused to permit Austin to gather hygiene supplies and his blood pressure medication before escorting him to a filthy cell lacking blankets, sheets, cleaning supplies, or a usable mattress.

A defendant can only be found to have violated the Eighth Amendment when two requirements are met; (1) the deprivation alleged must be, objectively, "sufficiently serious", and (2) the defendant must have a, subjectively, "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In other words, Spiller must have known about the alleged excessive risk to Austin's health or safety and had deliberate indifference toward that risk. Furthermore, the Seventh Circuit has specifically stated that it is not enough that a prison official "should have been aware" of the risk, *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 566 (7th Cir. 2021), but they must have subjectively known of the substantial risk.

There is "no static 'test'" that exists which would allow the courts to determine whether "conditions of confinement are cruel and unusual," and the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Were the conditions of Austin's confinement so bad that they would be deemed "cruel and unusual" if "prescribed...as the lawful punishment" for a particular crime? *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992).

Here, even if Austin could satisfy the objective prong of his claim, he cannot satisfy the subjective element of deliberate indifference as to defendant Spiller. Austin's entire claim rests on the fact that Spiller was aware of the conditions of his confinement and that he deliberately denied him his property, including medication, for days. However, there is no evidence in the record for a jury to infer that Spiller had any knowledge about the state of Austin's cell or that he was aware Austin did

not timely receive his property from cell house staff. Austin attests that Spiller was the one who escorted him to the "segregation unit" after his April 26, 2017, interview. (Doc. 181-1, p. 4). However, Austin does not allege and there is nothing in the record showing that Spiller ever came back to the cell after dropping him off in the restrictive housing unit, or that Austin notified Spiller of the condition of his cell. (Doc. 169-8, p. 81). There is also no evidence that Spiller had any role in Austin's cell assignment. (Doc. 169-8, p. 125).

As for denying Austin his property when he was transferred to segregation, Spiller does not dispute that he did not transport Austin's property, including bedding, hygiene items, and medication, at the same time he escorted Austin to North II. Spiller testified that, as Intelligence Unit Coordinator, it was not his job to retrieve the Austin's possessions from his old cell. (Doc. 169-8, p. 74). He stated that cell house staff would have inventoried Austin's property and then escort it to the North II property department. (*Id.*). Gee and Verble also stated in their depositions that prior to an inmate receiving personal property after being transferred to restrictive housing, the property is moved to the new unit, inventoried, and searched by staff. (Doc. 169-5, p. 54, 57; Doc. 169-6, p. 73). Gee further testified that inmates transferred from general population to restrictive housing receive a "bed roll," which consists of sheets and hygiene items (*Id.* at p. 57). The bed roll would have been compiled by the receiving cell house, but there is no guarantee that an inmate would receive those items right away (*Id.*).

Austin has failed to provide any evidence refuting this property procedure, and he does not claim that he informed Spiller he had not timely received his personal property from cellhouse staff at a later time. Thus, Austin has not established an issue of fact as to whether Spiller knew about and actively disregarded the risk to his safety regarding cell conditions and lack of property. Therefore, he has failed to satisfy the second element.

Furthermore, because there is no evidence in the record that Spiller deliberately placed Austin in a dirty cell and intentionally denied him property for days, Austin has not demonstrated that the deprivation that occurred was caused by Spiller or that Spiller's actions were motivated by Austin's First Amendment activity. *See Manual v. Nalley,* 966 F. 3d 678, 680 (7th Cir. 2020).

Therefore, in regard to Count 11, the Defendants motion for summary judgment is granted.

## IV.    COUNT 13

Austin alleges that his constitutional rights were violated when he was subjected to excessive and unnecessary strip searches prior to leaving his cell while in segregation pursuant to a policy implemented by Director Baldwin and Warden Lashbrook. (Doc. 181-1, p. 7-8).

The Court does not need to determine whether the strip searches were conducted in accordance with the Fourth or Eighth Amendment or whether Baldwin and Lashbrook are entitled to qualified immunity regarding this claim, as Austin has failed to present any evidence that the staff members who conducted the searches

were in fact acting pursuant to a policy or at the direction of Baldwin and Lashbrook. The only support for Austin's claim is his affidavit in which he attests that being forced to submit to a strip search prior to leaving cell was a "requirement." (Doc. 181-1, p. 8). Austin does not specify who instituted this requirement, and there is nothing in the record attributing the requirement to either Baldwin or Lashbrook or a policy they implemented. The record is also devoid of evidence that they had knowledge of this "requirement" or practice. Because there is nothing to demonstrate that Baldwin and Lashbrook were personally involved in the excessive strip searches, summary judgment will be granted as to Count 13. *See Knight v. Wiseman,* 590 F.3d 458, 463 (7th Cir. 2009) (to be personally responsible, an official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye").

## CONCLUSION

For the reasons stated above, this Court **DENIES** in part and **GRANTS** in part the Defendants' Motion for Summary Judgment (Doc. 169).

This action will proceed on the following counts:

**Count 1:** Spiller, Gee, Leek, Reichert, and Verble violated the First Amendment by placing Plaintiff in investigative segregation[3] in retaliation for refusing to cooperate with prison officials' investigation of a staff assault.

**Count 2:** Spiller retaliated against Plaintiff in violation of the First Amendment by issuing him a false disciplinary ticket.

---

[3] *See* footnote 1.

The claims against Baldwin, Brookman, Lashbrook, and Hart are **DISMISSED with prejudice.** The Clerk of Court shall terminate them as defendants and enter judgment in their favor at the conclusion of the entire action.

A status conference will be set at a later date to set firm dates for a final pretrial conference and jury trial. In the meantime, the parties are encouraged to discuss whether a settlement conference would be beneficial and, if so, request a referral to a magistrate judge for that purpose.

**IT IS SO ORDERED.**

**DATED:  September 7, 2022**

s/ *Stephen P. McGlynn*
**STEPHEN P. MCGLYNN**
**U.S. District Judge**